# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CHASITY WEST,                          :
      Petitioner,                 :
                              :
          v.                      :           3:06-cv-1112 (CFD)
                              :
LORI RICKS,                            :
      Respondent.                 :

## RULING ON PETITION FOR WRIT OF HABEAS CORPUS

Chasity West, following a jury trial in the Connecticut Superior Court, was sentenced to a term of life imprisonment for conviction on numerous charges relating to the murder of her nephew, Jarrell Cuyler, and the assault of her niece, Lindsey Cuyler.[1] She now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on five grounds. For the reasons that follow, West's petition is denied.

## I.      Background

### A.      Procedural History

West was charged with Burglary in the First Degree (Conn. Gen. Stat. § 53a-101(a)(1) & (a)(2)); Felony Murder (Conn. Gen. Stat. § 53a-54c); Murder (Conn. Gen. Stat. § 53a-54a); Capital Felony (Conn. Gen. Stat. § 53a-54b(9)); two counts of Risk of Injury to a Child (Conn. Gen. Stat. § 53-21(1)); Criminal Attempt to Commit Murder (Conn. Gen. Stat. §§ 53a-54a & 53a-49); and Assault in the First Degree (Conn. Gen. Stat. § 53a-59(a)(1)). The State of Connecticut sought the death penalty.

---

[1]West is the cousin of Jarrell and Lindsey's mother, Tammi Cuyler. Their relationship is more detailed in the text of this opinion.

Following the two-month guilt phase of the trial and nine days of deliberation, a twelve-person jury convicted the petitioner of all of the charges.  A sentence of death was not subsequently imposed by the jury; a sentence of life imprisonment was then imposed by the trial court.

The petitioner appealed to the Connecticut Supreme Court.  In a unanimous decision, the Connecticut Supreme Court rejected all five of the petitioner's claims and affirmed the trial court's judgment.  See State v. West, 274 Conn. 605 (2005).  West then filed the instant petition in the United States District Court for the District of Connecticut, purportedly raising the same five claims of error that she had raised before the Connecticut Supreme Court.

### B.    Factual Background

As recounted by the Connecticut Supreme Court, the following are the facts the jury reasonably could have found.  See State v. West, 274 Conn. 605, 610-22 (2005).

In July, 1998, West, a twenty-three-year-old licensed practical nurse employed at the State of Connecticut Cheshire correctional institution, had been involved romantically for almost three years with Arnold Cuyler, Tammi Cuyler's former husband.  Their relationship began shortly after Lindsey's birth, in August, 1995, while Arnold and Tammi still were married, and at a time when West, who was approximately seven years younger than Tammi, regularly babysat for Jarrell and Lindsey.  Tammi and Arnold separated in the fall of 1995 and divorced in March, 1996.  Under the terms of the divorce decree, Arnold, who resided in an apartment in Bristol, had visitation rights with Jarrell and Lindsey every other weekend and two nights a week.  Often, on his scheduled weeknight visits, Arnold would pick up Jarrell from daycare and Lindsey from the babysitter's home, and take them to Tammi's house, where he would care for them until she

returned from work.  Tammi kept a key to the house in Lindsey's diaper bag with which Arnold could let himself in on those days.

West, who resided with her parents in Windsor, felt deeply threatened by Arnold's continued relationship with Tammi, so much so that, unbeknownst to Arnold, she often followed him to Tammi's house on the days that he took Jarrell and Lindsey there.  West would park her car down the street to make sure that Arnold was not "getting too comfortable . . . ."  She referred to these excursions as "[m]issions . . . ."  Sometimes, West's teenaged cousins, India Riley and Amber Riley, would go with her, and she would ask them to describe the inside layout of Tammi's house.  West also periodically asked Arnold questions about the location of the rooms in Tammi's house.  Tammi had purchased the house in August, 1997, after her divorce from Arnold but, because of the tension between her and West, Tammi never invited West into her house.  Indeed, by that time, West's relationship with Arnold had caused tension not only between West and Tammi, but also between West and other members of their large, religious family, many of whom were aware of West's relationship with Arnold and disapproved of it.

Despite her family's disapproval, West desperately wanted to marry Arnold and move out of state with him.  Whenever she broached the subject with him, however, he told her that he could never marry her because she was Tammi's cousin and because of the tension in her family. He also told her that he would never move out of state because his children were too important to him to leave them.  West grew increasingly angry over Arnold's refusal to marry her and resentful of Jarrell, Lindsey and Tammi, whom she viewed as obstacles to the life that she envisioned for herself with Arnold.  Among other things, West was upset about how much money Arnold paid Tammi for child support.  Over time, West grew to hate Tammi even though

-3-

Tammi never harmed West in any way.

The tension in the family escalated in 1998 when Tammi initiated an investigation by the elders of her church into whether Arnold had committed adultery with West while Tammi and Arnold were married.  This infuriated West who, around this time, began to plot ways to harm Tammi.  In particular, in April or May, 1998, West telephoned Alexis Grajales, the eighteen-year-old boyfriend of her cousin, India Riley, to tell him about a job opening at the University of Connecticut Health Center.  During that conversation, however, West also asked Grajales if he knew anyone who had any knowledge about explosives.  He told her no.  West called Grajales a number of times over the next several weeks with similar inquiries, among them whether he knew where she could get a gun and whether he knew anyone who would kill someone for money.  According to Grajales, West told him that Tammi had been "terrorizing" her for years and that West needed to "deal" with her.  She also told him, however, that, although she wanted to deal with Tammi in some way, she did not want to kill her because, in that event, she would have to take care of Tammi's children.

In late May, 1998, West solicited Grajales' involvement in a plan that West had devised to vandalize Tammi's home.  Specifically, West offered to pay Grajales $4000 if he would enter Tammi's home with West and restrain Tammi while West vandalized the home.  Grajales agreed. His understanding "was that it was going to be some . . . vandalism to scare Tammi, nothing else, [just] mess up the house . . . ."[2]  In furtherance of the plan, on June 7, 1998, West and Grajales

_____

[2]West testified at trial in her own defense.  In her testimony, she acknowledged that she had given Grajales $3400 on July 6, 1998, two days before the burglary and the attack. West claimed, however, that she had given Grajales the money to help him make a down payment on a car and to purchase an engagement ring.  West also testified that when she gave him the money, she told him, "if [he] really could get [Tammi] to cut the 'BS,' [he could] ... keep all of [the

went to a department store in East Hartford and purchased a flashlight and two pairs of navy blue coveralls for use in the burglary.  Several days later, on June 11, West asked her cousin, Amber Riley, to go with her to their grandmother's house to see if Tammi's house key was in Lindsey's diaper bag.[3]  West later told Grajales that she was able to get the key from the bag and make a copy of it.

West and Grajales originally planned to vandalize Tammi's house on July 7, 1998.  That evening, however, West called Grajales and told him that she was with Arnold and could not leave.[4]  While she had Grajales on the telephone, she asked him to buy a "rug cutter . . . with a button that lets the blade adjust."  Grajales later went out and purchased such a cutter.[5]

The following evening, July 8, West and Grajales spoke on the telephone, and West advised Grajales that they could go forward with their plan that night.  She further indicated that she would contact Grajales when he was to leave his house to meet her.

That same evening, West arrived at Arnold's apartment in Bristol at approximately 8 p.m.  After spending the evening there, West left at approximately 12:30 a.m.  Between 12:30 a.m. and 1:10 a.m., West called Grajales six times on her cellular telephone while driving from Bristol to

money]."

[3]In her trial testimony, West admitted to stealing the key to Tammi's house from Lindsey's diaper bag and making a copy of it.

[4]In fact, West was not with Arnold on the evening of July 7, 1998, as she told Grajales.  Rather, that evening, Lindsey spent an unscheduled overnight visit with Arnold at his apartment.  Jarrell also spent the night away from home, at his grandmother's house.  At trial, the state maintained that West had changed her plans only after learning from Arnold that Lindsey and Jarrell would not be at home that evening.

[5]It appears that the cutter that Grajales had purchased was a type of box cutter.

Windsor to meet him.  During one of the calls, she told him not to forget the coveralls, the cutter and the flashlight.  She also told him to bring an empty container, such as a soda bottle.  West assured Grajales that Lindsey and Jarrell would not be at home because they were spending the night with their grandmother.

Grajales met West at a shopping plaza in Windsor, as planned.[6]  They then proceeded in separate cars to a nearby service station where Grajales produced a two-liter soda bottle that they filled with gasoline.[7]  Because the bottle had no cap, they placed a cookie wrapper in the opening of the bottle to keep the gasoline from spilling.  A video surveillance camera captured West shortly before 2 a.m. as she entered the service station office to pay for the gasoline.[8]  Upon leaving the station, Grajales followed West to the parking lot of an apartment complex that was within walking distance of Tammi's house.[9]  There, West changed into one of the navy blue

---

[6]West and Grajales had taken a ride to the shopping plaza a few days earlier in order to familiarize themselves with it as a meeting place.

[7]West previously had raised the prospect of setting one of Tammi's rooms on fire, and Grajales presumed that that was why West had wanted to fill the soda bottle with gasoline.

[8]At trial, West admitted meeting Grajales at the service station in the early morning hours of July 9, 1998.  She claimed, however, that she did not go with him to Tammi's house.  Rather, West testified that, after Grajales left, she remained at the service station for a while before going home, listening to the radio and cleaning the backseat of her car.  She also testified that Grajales had assured her that he was only going to pull a "prank" at Tammi's house, "just to aggravate her and shake her up a little bit."  The plan, according to West, was for Grajales to sneak into the house and leave the gasoline bottle so that, when Tammi woke up, she would know that someone had been there and would be scared.  West testified that the prank was worth $3400 to her because she disliked Tammi so much.

[9]At the time of his arrest, Grajales told police that, while driving to the apartment complex near Tammi's house, he saw "a police cruiser behind [them] and saw [it] drive past [them as he and West] pulled into the parking lot . . . ."  As fate would have it, the police officer following Grajales' car ran a check on the license plate and was informed by the Windsor police department dispatcher that the car was registered to a residence in East Hartford.  At trial, the

coveralls and made two masks from a pair of nylon stockings.[10]  She also put on a pair of latex

gloves from a box that she had in her car and gave Grajales a pair to wear.  They then drove in

West's car a short distance to Tammi's house and proceeded to the front door.  West was

carrying the soda bottle filled with gasoline.  Using the duplicate key that she made from the key

that she had taken from Lindsey's diaper bag, West opened the front door to Tammi's small,

two-story residence and, along with Grajales, entered the residence.

At that time, Lindsey and Jarrell were sleeping with Tammi in her bed in her first floor

bedroom.[11]  Their baby cousin, Daniel Henderson, who was residing there, also was asleep in a

crib in Tammi's bedroom.  Tammi was awakened by a noise from the front of the house and got

up to investigate.  As she approached the front door, she observed two people standing in the

foyer, dressed in identical, navy blue clothing and wearing nylon stocking masks over their

heads.  Tammi turned to run, but Grajales overtook her, tackled her and pinned her, face down, to

the floor.  Placing a hand over her mouth, Grajales told Tammi to be quiet and that no one would

---

officer testified that he saw a car directly in front of Grajales' vehicle and that both of the cars
turned into the apartment complex.

[10]The police never recovered the coveralls but found a receipt for them in West's
bedroom during a search of her parents' home, where she resided.  At trial, West admitted
purchasing the coveralls but claimed that she had purchased them for her two brothers as an
inducement for them to clean their parents' backyard.  West testified, however, that when she got
home from the department store where she purchased the coveralls, she realized that they would
not fit either one of her brothers.  She further testified that, before she could return them to the
store, they were destroyed by pool chemicals in the trunk of her mother's car and discarded.
West's mother and brother corroborated West's testimony about the coveralls.

[11]Although Jarrell and Lindsey had separate bedrooms on the second floor of Tammi's
house, it was not uncommon for them to sleep with Tammi in her bedroom, which was located
on the first floor.

get hurt.[12]

West, meanwhile, headed straight to Jarrell's and Lindsey's bedrooms on the second floor.  Finding them unoccupied, she immediately returned to the first floor, entered Tammi's bedroom and closed the door.  Shortly thereafter, Tammi heard Lindsey whimpering and Jarrell ask, "What are you doing?"  Upon hearing their voices, Tammi desperately tried to free herself from Grajales' hold; in doing so, Tammi managed to pull off one of the gloves that he was wearing and his wristwatch.  At some point during the struggle, Grajales removed his hand from Tammi's mouth long enough to hear her plead with him not to hurt her children. Realizing then that the children were at home, and not at their grandmother's house, as West had assured him they would be, Grajales immediately released Tammi, yelled to West that he was leaving and ran from the house. West followed a few moments later, leaving the gasoline-filled soda bottle on a night stand in Tammi's bedroom.[13]

A scene of unimaginable horror awaited Tammi in her bedroom.  Lindsey was standing just inside the door with blood pouring from a wound above her wrist.  Tammi picked her up and ran upstairs to get a towel for the bleeding.[14]  Upon returning to the bedroom, Tammi called to

---

[12]Tammi testified that she had assumed, and later had told the police, that the other intruder also was a male, although she never actually had heard that intruder's voice. According to Tammi, however, she noticed that, in addition to being shorter than the man who had held her down, the other intruder's hair was puffier under his or her mask than the taller of the two intruders.

[13]Grajales made his way on foot back to the apartment complex, where he retrieved his car and drove home to East Hartford.  Upon his arrival, he received a telephone call from West, who asked him if he would get rid of her coveralls for her.  He refused.  West's cellular telephone records indicate that she called Grajales three times between 2:45 a.m. and 2:50 a.m.

[14]Lindsey's throat also was cut, but the wound was not life threatening.  The laceration to her forearm, however, severed a nerve and an artery, and required extensive surgery.  She was

Jarrell who, at first, appeared to be sleeping.  When he did not respond, Tammi reached for him, turned him over and observed a deep gash in his neck.  Tammi then dialed 911 and pleaded with the operator to send help, explaining that two men had broken into her house and had attacked her children.  Tammi told the operator that she feared that her son was dead, and that "they had almost cut his head off."  The first ambulance arrived at the scene at 2:39 a.m. and transported Jarrell to Hartford Hospital, where he was pronounced dead at 2:58 a.m.  In addition to the laceration on his neck, Jarrell also had lacerations on his left and right forearms, immediately above his wrists.[15]  Tammi's infant nephew, Daniel Henderson, was not harmed.[16]

　　　The police interviewed West on the day of the murder.  She told them that she had been at Arnold's apartment in Bristol the night before, but had driven home to her parent's house at approximately 1 a.m. and had not made any stops along the way.  In her statement, she said that her relationship with Arnold was not serious and that there was not much animosity between her and Tammi.

　　　When television news reports of the murder featured a photograph of the wristwatch that Tammi had pulled off of one of her assailants, both Grajales and West became concerned that

---

hospitalized for approximately one week.

　　　[15]According to the autopsy report, Jarrell's neck was cut by a sharp instrument that severed his trachea and partially severed one of his jugular veins and his esophagus.  The autopsy also revealed a compression of the neck caused by some kind of ligature.  The medical examiner determined that the cause of death was a combination of strangulation and sharp force trauma to the neck.  West most likely strangled Jarrell with the cord from the base unit of the cordless telephone located in Tammi's bedroom.  The cord, which was found by police draped over the pillow of Tammi's bed, had not been there when Tammi and the children went to bed.

　　　[16]At trial, the state argued that only someone familiar with the family would have known that Daniel was not one of Tammi's children, thereby explaining why he was the only one of the three children who was not harmed.

someone might connect Grajales to the watch, or that it might contain traces of his DNA.  They also were worried that the soda bottle that they had left at the house might connect one or both of them to the crime scene.  West asked Grajales to return the money that she had given him, which he did, so that her bank account would not arouse suspicion.  She also told Grajales that, if the police questioned him about the watch, he should tell them that, on the night of the murder, he had stopped to help a man whose car had run out of gas and that, after getting gasoline for the man, Grajales sold him his watch.

On July 16, 1998, Grajales went to the Windsor police station with counsel to answer certain questions that the police had for him.  Grajales told the police that, at approximately 1:45 a.m. on the night of the murder, he was driving home to East Hartford from Windsor when he was flagged down by a man whose car had run out of gas.  He told the police that, at the man's request, he went to a nearby service station to purchase gasoline and, while at the station, he ran into West.  He further explained that, after he had filled an empty soda bottle with gasoline, West gave him a cookie wrapper to put in the opening of the bottle to keep the gas from spilling.  Consistent with the story that West had concocted, Grajales also told the police that when he returned with the gasoline, the man bought his watch from him for $150.

After hearing Grajales' story, the police suspected that West had not been truthful with them and requested another interview with her. West arrived at the police station at approximately 12:20 a.m. on July 17, 1998, where she was interviewed by Detective James McGlynn of the Connecticut state police and Sergeant Mark Francis of the Windsor police department.  They asked West to recount everything that she had done on July 8 and July 9,

-10-

1998.  From the start of the interview, West was evasive and repeatedly changed her answers.[17]

Finally, Francis showed West three photographs of Jarrell that were taken at the time of his

autopsy and told her that he did not believe that she was telling the truth.  He also stated that it

was time for her to do so.  He then asked her, "Who killed Jarrell?"  West replied, "I did."  West

then placed her face in her hands and stated, "What have I done?"[18]

    After confessing to the murder, West sobbed and stared vacantly at the wall.  When

McGlynn asked West whether she needed anything, she replied, "Just shoot me. I do not want to

go to jail."  McGlynn then left the room to get West a glass of water and a tissue.  While in the

hallway, McGlynn consulted with a superior officer, and they decided that West should be

advised of her Miranda[19] rights.  McGlynn returned to the interview room and read West those

rights from a form used by the Windsor police department.  When McGlynn had finished reading

---

    [17]For example, West initially told the investigating officers that she had gone directly
home upon leaving Arnold's house in Bristol in the early morning hours of July 9, 1998.  They
then asked her if she had stopped anywhere along the way.  After a long pause, West told them
that she had stopped at a fast-food restaurant, but that she did not stay there because the line was
too long.  They then asked her if she had made any other stops, and she replied that she had
driven to another restaurant, but that, after getting to the parking lot of the restaurant, she decided
that she did not want anything to eat and drove directly home.  When asked if she had stopped for
gasoline, West paused and said that she had.  She also indicated that she had not met anyone she
knew at the service station.  When pressed, however, she acknowledged that she had run into
Grajales there.  She then proceeded to tell them a story identical to the story that Grajales had
told them about the stranded motorist, the gasoline and the cookie wrapper.

    [18]At trial, West denied that she had confessed to murdering Jarrell.  She testified, rather,
that, at a certain point in the interview, McGlynn left the room, and, while he was gone, Francis
said to her, "[Y]ou killed Jarrell."  West testified that she had replied, in the form of a question,
"I did?"  West further testified that Francis then said to her, "I could take that as a confession if I
wanted to," and that she had responded, "[C]onfession? ... I didn't confess to anything."

    [19]Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

West her rights, West indicated that she understood them and initialed the form.[20]  Then, experiencing a change of heart, West informed the officers that she "didn't confess to anything" and that she "wanted an attorney."  She also told them that she was "sorry."

On July 23, 1998, the police searched West's vehicle.[21]  During the search, the police observed a blood-like substance on the front top portion of the windshield wiper control lever. The police removed the lever and sent it to the state police forensic laboratory, where DNA testing confirmed to a reasonable degree of scientific certainty that the substance was Jarrell's blood.[22]

Grajales entered into a plea agreement with the state on July 27, 1998.  Under the terms of that agreement, the state agreed to recommend a sentence of not more than twenty-five years imprisonment in exchange for his guilty pleas to the crimes of felony murder, burglary in the first degree and kidnapping in the first degree, and his cooperation and truthful testimony.  In accordance with the agreement, Grajales testified about his role and West's role in the offenses.

---

[20]At trial, West testified that she did not initial the notice of rights form voluntarily.  She explained, rather, that one of the officers had put a pen in her hand, placed his hand over hers, and forced her to write her initials on the form.

[21]Although the police already had searched West's vehicle following the attack, that search had been conducted prior to West's confession.

[22]The defense offered two possible innocent explanations for the presence of Jarrell's blood on the windshield wiper control lever of West's car.  First, Paul West, Jr., one of West's brothers, testified that, on the morning of Jarrell's murder, he went to Hartford Hospital with his mother and sisters and that, while he was there, he touched Jarrell's wounds.  He further testified that, after doing so, he drove West's car home.  As a possible alternative explanation, Paul West, Jr., testified that he had helped clean Tammi's house after the police had finished processing the crime scene, and that he may have gotten some of Jarrell's blood on him while he was cleaning. He further testified that he drove West's car home when he left the house, and that any blood that he may have picked up while cleaning may have been transferred to the windshield wiper control lever at that time.

West sought to demonstrate to the jury that Grajales was lying to protect an unidentified friend, and that that friend, and not West, had accompanied Grajales during the attack.

West testified in her own defense. Although she admitted that she had conceived the plan to burglarize Tammi's house, she insisted that she personally had not entered the house but, rather, that Grajales had done so. West also testified that the purpose of the burglary was only to scare Tammi, and that she never had intended any physical harm. In support of her claim that she personally had not entered the house, West adduced alibi testimony from her mother, her brother and her sister, all of whom explained that West had come home sometime between 2 a.m. and 2:30 a.m. on the night of the offenses and then went back out to pick up food for the family at an all night diner in East Hartford.[23] West's family members further testified that West had returned home with the food shortly after 3 a.m. On the basis of their testimony, West maintained that she could not have been in Tammi's house between 2 a.m. and 2:30 a.m., when the offenses were committed.

---

[23]The defense also sought to explain certain cellular telephone calls that West had made. The state established that West had placed thirty-seven such calls to Grajales' residence in the month leading up to the attack. Between 12:30 a.m. and 3:07 a.m. on the morning of the attack, West made thirteen calls on her cellular telephone, nine of which were to Grajales' residence. At 1:23 a.m., West called her family's residence. At trial, West's mother testified that, during that call, she had asked West to bring home some food. Between 1:23 a.m. and 2:39 a.m., however, not a single call was placed on West's cellular telephone. In support of its case against West, the state underscored the fact that this lull in West's cellular telephone use corresponded precisely to the period of time that West was with Grajales, first at the gas station and then at Tammi's house. Moreover, at 2:39 a.m., just as the first ambulance was arriving at Tammi's house, activity on West's cellular telephone resumed, first with a call to West's family's residence, followed by three successive calls to Grajales' residence. All four calls were placed from a location somewhere between Windsor and East Hartford, where Grajales resided and where he went immediately upon leaving Tammi's house in Windsor. See footnote 13. West testified that the 2:39 a.m. call to her home was made while she was driving to an all night diner in East Hartford, where she claimed that she had gone to buy food for her family. The purpose of the call, according to West, was to find out whether anyone in her family wanted soda.

## II.    <u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act ("AEDPA") establishes a "deferential standard of review" of a state court's adjudication of the merits of a petitioner's claim.  Wilson v. Mazzuca, 570 F.3d 490, 499 (2d Cir. 2009) (quoting Dolphy v. Mantello, 552 F.3d 236, 238 (2d Cir. 2009)).  A federal court cannot grant a petition for a writ of habeas corpus filed by a person in state custody with regard to any claim that was rejected on the merits by the state court unless the adjudication of the claim in state court either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); <u>see also</u> <u>Waddington v. Sarausad</u>, 129 S.Ct. 823, 831 (2009).  A claim that a state conviction was obtained in violation of state law is not cognizable in the federal court. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991).  Under AEDPA's framework, "we ask three questions to determine whether a federal court may grant habeas relief: (1) Was the principle of Supreme Court case law relied upon in the habeas petition 'clearly established' when the state court ruled?  (2) If so, was the state court's decision 'contrary to' that established Supreme Court precedent?  (3) If not, did the state court's decision constitute an 'unreasonable application' of that principle?"  Williams v. Artuz, 237 F.3d 147, 152 (2d Cir. 2001).

Clearly established federal law is found in holdings, not dicta, of the Supreme Court at the time of the state court decision.  <u>See</u> <u>Carey v. Musladin</u>, 549 U.S. 70, 74 (2006).  It "may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context."  Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir.

2002).  A decision is "contrary to" clearly established federal law where the state court applies a rule different from that set forth by the Supreme Court, or if it decides a case differently than the Supreme Court on essentially the same facts.  See Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court unreasonably applies Supreme Court law when the court has correctly identified the governing law, but unreasonably applies that law to the facts of the case.  Id.  The state court decision must be more than erroneous; it also must be objectively unreasonable, "a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007); see also Waddington, 129 S.Ct. at 831.

When reviewing a habeas petition, the federal court presumes that the factual determinations of the state court are correct.  The petitioner has the burden of rebutting that presumption by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1); Boyette v. Lefevre, 246 F.3d 76, 88-89 (2d Cir. 2001) (noting that deference or presumption of correctness is afforded state court findings where the state court has adjudicated constitutional claims on the merits).  Because collateral review of a conviction applies a different standard than the direct appeal, an error that may have supported reversal on direct appeal will not necessarily be sufficient to grant a habeas petition.  See Brecht v. Abrahamson, 507 U.S. 619, 634 (1993).

Finally, a state prisoner must exhaust available state remedies before seeking a writ of habeas corpus.  28 U.S.C. § 2254(b)(1); Acosta v. Artuz, 575 F.3d 177, 184 (2d Cir. 2009).  The exhaustion doctrine requires that the petitioner gave the State the "opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.  Baldwin v. Reese, 541 U.S. 27, 29 (2004) (internal quotations omitted).  "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court . . ., thereby alerting that court to the federal nature of the claim."  Id. (quoting Duncan v. Henry, 513 U.S. 364, 365

(1995)).  A claim will not be considered to have been fairly presented to the state appellate court

"if that court must read beyond a petition or a brief (or a similar document) that does not alert it

to the presence of a federal claim in order to find material . . . that does so."  Id. at 32.

**III.    Discussion**

West challenges her convictions on five grounds, arguing that the trial court violated (1)

her right to trial by an impartial jury by not properly addressing juror misconduct; (2) her right to

present a defense and to a fair trial when it refused to admit into evidence certain latent prints

found at the crime scene; (3) her right to present a defense when it refused to permit the

testimony of Nicole Coleman concerning prior misconduct of Grajales; (4) her right to due

process in its jury instructions regarding two government witnesses that were not called to testify

at trial; and (5) her right to due process when it permitted expert testimony on microscopic hair

analysis.

**A.       Juror Misconduct**

Between the penalty and guilt phases of West's trial, one of the alternate jurors advised

the clerk that she had been in contact with other jurors after the verdict was rendered.  The trial

court investigated by questioning the two alternate jurors, H and P, and five regular jurors.  Upon

the trial court's questioning, Alternate H stated that during a break in the court's jury

instructions, she and Alternate P had participated in the selection of the jury foreperson.

Alternate H also told the trial court that during another break in the jury charge, and while the

alternates were still present, two jurors had suggested to the other jurors that once they started

deliberations, they begin by taking a straw poll on the issue of guilt.  However, at no time did the

jurors take a straw poll or express an opinion regarding West's guilt or innocence in the presence

of the alternates.

In questioning Juror W, the trial court also learned that Alternate P had called him during the deliberations.  During the telephone call, Alternate P asked Juror W, "[W]hat's going on?" After Juror W told Alternate P that the jurors were deliberating and that he did not "have the foggiest idea when [they would] be done," the conversation promptly ended.  Juror W did not discuss with Alternate P anything else about the case or the deliberations.

West thereafter filed a motion for a mistrial or a more thorough investigation of the juror misconduct.  The trial court denied the motion, concluding that although each of the incidents constituted juror misconduct, they did not, when viewed either alone or together, prejudice West.

On direct appeal, West claimed that she was entitled to a new trial as a result of each of the three instances of juror misconduct: the alternates' participation in the selection of the foreperson; the predeliberation suggestion that the jury should take a straw poll; and Alternate P's phone call with Juror W during deliberations.  (Petr.'s Conn. S.C. Br. at 41-54; Petr.'s Conn. S.C. Reply Br. at 13-20.)  West also argued that the trial court failed to conduct an adequate investigation to determine whether she had been prejudiced by the alternates' participation in selection of the foreperson.  (Petr.'s Conn. S.C. Br. at 49-50; Petr.'s Conn. S.C. Reply Br. at 17-20.)  The Connecticut Supreme Court denied West's claims of error.

The petitioner now argues that the Court should grant her petition for habeas corpus based on the three instances of juror misconduct, as well as the trial court's inadequate investigation.  The State argues that West has not exhausted these claims because she did not raise them as violations of federal law before the Connecticut Supreme Court.  In her direct appeal, West argued that her right to an impartial jury, as guaranteed by the Sixth Amendment of

-17-

the United States Constitution and the Connecticut Constitution, was violated by the trial court's

failure to find prejudice per se as a result of the participation of the alternates in selecting the

foreperson.  (See Petr.'s Conn. S.C. Br. at 41-45.)  The bulk of West's argument before the

Connecticut Supreme Court concerned Connecticut law, and West did not explicitly rely upon a

holding of the United States Supreme Court.  Nevertheless, although a close question, the Court

finds that West did exhaust her claims regarding the foreperson selection because the

Connecticut Supreme Court had the opportunity to rule on the questions of whether the

alternate's participation should be governed by a rule of per se prejudice, and whether there was

actual prejudice, as federal claims.  See Baldwin, 541 U.S. at 29; see also West, 274 Conn. at

647-52.  The Court, however, finds that West failed to exhaust her remaining claims regarding

juror misconduct.  Specifically, she failed on direct appeal to argue that the premature

deliberation, improper juror phone call, and inadequate investigation were violations of federal

law.  (See Petr.'s Conn. S.C. Br. at 49-54; Petr.'s Conn. S.C. Reply Br. 17-20.)[24]  Therefore, the

Court will only address the petitioner's arguments that: (1) the state court's failure to apply a rule

of per se prejudice was a violation of federal law, and (2) the state court's failure to find

prejudice involved an unreasonable determination of the facts.

      1.    Per Se Prejudice

West argues that the Connecticut Supreme Court unreasonably applied United States

Supreme Court precedent in holding that the alternates' participation in selection of the jury

_____

[24]West did argue that the trial court's rulings regarding premature deliberation, the
improper juror phone call, and the sufficiency of the jury investigation violated her right to an
impartial jury, but in support she cited only state case law; nothing in her argument alerted the
Connecticut Supreme Court to the federal nature of these arguments.  See Baldwin, 541 U.S. at
29.

foreperson was not per se prejudice.  In particular, West argues that the clearly established federal law as determined by the Supreme Court is the holding of a Tenth Circuit case, United States v. Beasley, 464 F.2d 468 (10th Cir. 1972), which was "not abandoned or abrogated by the Supreme Court" in its decision in United States v. Olano, 507 U.S. 725 (1993).  (See Petr.'s Reply Mem. at 2.)  West argues that the Connecticut Supreme Court incorrectly interpreted Olano and its relation to Beasley.

In Beasley, the United States District Court for the Western District of Oklahoma made a finding that no prejudice resulted to the defendant when an alternate juror participated in the vote for the jury foreperson.  The Tenth Circuit Court of Appeals reversed and declared a mistrial, holding:

> When the case was submitted and the jury retired to deliberate, it then, with the selection of the foreman or with any other act to organize or plan the deliberation, began its own proceedings.  Once these proceedings commenced, "the jury" consisted only of the prescribed number of jurors.  The alternate then became as any other stranger to the proceedings regardless of whether she had been discharged. . . .  Their presence destroys the sanctity of the jury and a mistrial is necessary.

Beasley, 464 F.2d at 469-70.  In Olano, the United States Supreme Court held that the presence of alternate jurors in the jury room during deliberations, who had been instructed that they could sit in on the deliberations but were not to participate, did not affect substantial rights of the defendant, and therefore did not constitute plain error under Fed. R. Civ. P. 52(b).  Olano, 507 U.S. at 741.  The Supreme Court in Olano cited to Beasley, but neither specifically approved or disapproved of its holding.

In rejecting West's argument, the Connecticut Supreme Court relied on Olano rather than Beasley, and found that a rule of per se prejudice was not mandated by the Sixth Amendment.

-19-

Citing to <u>Olano</u>, the State Supreme Court stated as follows:

> "Although the presence of alternate jurors does contravene the cardinal principle that the deliberations of the jury shall remain private and secret . . . the primary if not exclusive purpose of jury privacy and secrecy is to protect the jury's deliberations from improper influence.  [I]f no harm resulted from this intrusion [of an alternate juror into the jury room,] reversal would be pointless." (Citation omitted; internal quotation marks omitted.)  <u>Id.</u>, at 737-38, 113 S.Ct. 1770.  <u>Olano</u> governs our resolution of the present case. . . .  The guiding general principle of <u>Olano</u> is that prejudice will not be presumed unless an alternate juror actually participated in jury deliberations.  <u>See id.</u>, at 739-41, 113 S.Ct. 1770.  The selection of a foreperson, however, is not a part of jury deliberations.  Consequently, the rationale of <u>Olano</u> applies with full force to the present case.  We therefore require a showing of prejudice.

<u>West</u>, 274 Conn. at 650-51 (citations and alterations in original).

The Connecticut Supreme Court's holding was not contrary to and did not involve an unreasonable application of any federal law as determined by the United States Supreme Court. West's argument relies on a rule of per se prejudice as announced by the Tenth Circuit Court of Appeals, not the United States Supreme Court.  Clearly established federal law is found in holdings, not dicta, of the Supreme Court at the time of the state court decision.  Carey, 549 U.S. at 74.  That the Supreme Court did not specifically overturn the Tenth Circuit's decision in <u>Beasley</u> is not a holding of the Supreme Court.  Therefore, that the Connecticut Supreme Court's decision is arguably contrary to a Tenth Circuit precedent is not relevant on federal habeas corpus review.

Furthermore, the relevant Supreme Court precedent does not suggest a rule of per se prejudice is appropriate.  In <u>Smith v. Phillips</u>, the Supreme Court held that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." 455 U.S. 209, 217 (1982).  "Due process," the Court continued, "means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to

prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.  Such determinations may properly be made at a hearing" held by the trial court judge. Id.; see also Rushen v. Spain, 464 U.S. 114, 119-20 (1983) ("The prejudicial effect . . . can normally be determined by a post-trial hearing.  The adequacy of any remedy is determined solely by its ability to mitigate constitutional error, if any, that has occurred.  Post-trial hearings are adequately tailored to this task.") (internal citations omitted).  Because the United States Supreme Court does not require a finding of per se prejudice when faced with the possibility of juror bias, the Connecticut Supreme Court's failure to apply such a rule of per se prejudice was not contrary to and did not involve an unreasonable application of federal law as decided by the United States Supreme Court.

2.     Actual Prejudice

West next argues that the state court's finding that no prejudice resulted from the alternates' participation in selection of the foreperson involved an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2).  She argues that the unreasonable determination of the facts resulted from the failure of the trial court to conduct a complete investigation into the effect on the jury of the alternates' participation.  As mentioned above, AEDPA provides that on habeas review "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1)

West has failed to meet her burden to rebut the presumption of correctness of the state court's determination that the alternates' participation in selecting the foreperson did not actually prejudice West.  The Connecticut Supreme Court found that West had failed to demonstrate

prejudice flowing from the alternate jurors' participation in the selection of the foreperson.  In

particular, the Connecticut Supreme Court noted that the trial court had instructed the jury that

the foreperson "has no more weight or authority than the other eleven jurors," and that "[h]e or

she is just your spokesperson with the court."  West, 274 Conn. at 645.  It then concluded that

"[i]n view of the trial court's instruction, there is no reason to believe that the jurors treated the

foreperson any differently than any other juror."  Id.  West has not presented any persuasive

argument to rebut the presumption that West was not prejudiced by the alternates' participation

in selection of the foreperson where the trial court specifically instructed the jury that the

foreperson's only additional role was to communicate with the court.

### B.    Fingerprint Evidence

At trial, West sought to introduce evidence of unidentified finger and palm prints that

were recovered from Ms. Cuyler's home.  The unidentified prints were from two different places;

one was taken from a door jamb in the first floor bedroom, and the other was taken from the

second floor bathroom door.  The prints belonged to neither West nor Grajales, and West

claimed they were central to her defense because they tended to support her theory that some

unidentified person had accompanied Grajales into the home at the time of the intrusion.  The

trial court found that West had failed to make a showing of the circumstances under which the

prints had been made, or when they had been made, and therefore excluded the prints as

irrelevant.[25]  On direct appeal to the Connecticut Supreme Court, West argued that exclusion of

---

[25]The defense called a fingerprint expert who testified that a fingerprint taken from the
soda bottle did not match the prints of the defendant, Tammi Cuyler or Jarrell Cuyler.  He also
testified that he did not identify any prints at the crime scene that matched the defendant's prints.
274 Conn. at 801-02.

-22-

the fingerprints violated her Sixth and Fourteenth Amendment rights. The State does not dispute that this claim was exhausted on direct appeal.

West now argues that the Connecticut Supreme Court's rigid application of state evidentiary rules was in violation of her Sixth Amendment right to present a defense and Fourteenth Amendment right to due process. West argues that the excluded fingerprint evidence creates a reasonable doubt that would not otherwise exist, and that the exclusion of that evidence deprived her of a fair trial. In particular, West claims that because her theory of the case was that she was not the second intruder with Grajales, fingerprint evidence that did not match West or Grajales was relevant and tended to indicate there had been a different second intruder. In support of her argument that the Connecticut Supreme Court was incorrect in denying relief, West relies in large part on the Connecticut Supreme Court's decision in State v. Cerreta, 260 Conn. 251 (2002).[26]

Whether the Connecticut Supreme Court correctly applied Connecticut precedent, the Cerreta case that petitioner relies upon cannot serve as the basis for a writ of habeas corpus. Rather, this Court must examine whether the Connecticut Supreme Court's ruling was contrary

---

[26]The Court in Cerreta, however, specifically stated that while it has "recognized consistently that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime," the "defendant must . . . present evidence that directly connects a third party to the crime." Id. at 262-63. The Court in Cerreta found that connection existed because the evidence "that a third party's hair and fingerprints were found at the crime scene is more than a bare suspicion that someone other than the defendant may have committed the crime." Id. at 263. Although West argues the latent print evidence she sought to introduce is similar to the evidence improperly excluded in Cerreta, it was not. West's evidence was simply latent fingerprints in a house, and she presented no other evidence of their connection to the crime. In Cerreta, on the other hand, the hair and fingerprints at issue were taken from "the victim's body, the ligatures used to bind her hands and feet, and the personal effects on and around her body." Id.

to or involved an unreasonable application of clearly established federal law as announced by the

United States Supreme Court.  28 U.S.C. § 2254(d).

In Crane v. Kentucky, the United States Supreme Court held as follows:

> Whether rooted directly in the Due Process Clause of the Fourteenth Amendment,
> or in the Compulsory Process or Confrontation clauses of the Sixth Amendment,
> the Constitution guarantees criminal defendants "a meaningful opportunity to
> present a complete defense." . . .  That opportunity would be an empty one if the
> State were permitted to exclude competent, reliable evidence bearing on the
> credibility of a confession when such evidence is central to the defendant's claim
> of innocence.

476 U.S. 683, 690 (1986) (internal citations omitted).  In Crane, the Supreme Court rejected as

unconstitutional a state court rule that excluded evidence bearing on the credibility of a

confession when such evidence was central to the defendant's claim of innocence.  Id.  The

Supreme Court found that the state court had improperly excluded evidence about the

environment in which the police secured the defendant's confession because "evidence about the

manner in which a confession was obtained is often highly relevant to its reliability and

credibility."  Id. at 691.

The right to present a defense is not, however, necessarily infringed upon by state

procedural and evidentiary rules.  Instead, in the exercise of the right to present a defense, "the

accused, as is required of the State, must comply with established rules of procedure and

evidence designed to assure both fairness and reliability in the ascertainment of guilt and

innocence."  Chambers v. Mississippi, 410 U.S. 284, 302 (1973).  Moreover, "the Constitution

leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is

'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or]

confusion of the issues.' "  Crane, 476 U.S. at 689-90 (quoting Delaware v. Van Arsdall, 475

U.S. 673, 679 (1986)).

On direct appeal, the Connecticut Supreme Court began by acknowledging West's right to present a defense as established in Crane, and then upheld the trial court's exclusion of the latent fingerprint evidence, as follows:

> Although the existence of the unidentified latent prints does establish that another person or persons were in the second floor bathroom doorway and in the doorway of the first floor master bedroom, that showing alone is insufficient to render the evidence admissible.  First, there is nothing in the record to indicate when the prints were made; for all that appears, the prints were made weeks, months or even years before the commission of the offenses that are the subject of this appeal.  Second, there is nothing in the record linking the prints to any particular individual or individuals, or to any class of individuals. Consequently, the determination of whether the prints were left by a houseguest or other invitee, on the one hand, or by an unidentified perpetrator, on the other, necessarily would require impermissible speculation. . . .  Because the nexus between the prints and the crime scene is so attenuated, and because there are so many likely explanations for the prints aside from the mere possibility that they were left by an unidentified perpetrator, the evidence of the prints is lacking in probative value.

West, 274 Conn. at 626-27.

The Connecticut Supreme Court's ruling was not contrary to and did not involve an unreasonable application of federal law as announced by the Supreme Court in Crane and Chambers.  In those cases, the Supreme Court acknowledged that courts can constitutionally exclude evidence that is not relevant or would tend towards confusion.  Crane, 476 U.S. at 690. In the instant case, as the Connecticut Supreme Court found, West could not connect the latent fingerprint evidence to any aspect of the crime.  The prints could have been left by any two people who had been in the house in the weeks, months, or years leading up to the crime, and there was no indication that the prints were at all related to the commission of the crime. Because West could not provide any assurances of relevancy, the state court did not violate

-25-

West's right to present a defense by excluding the evidence based on state evidentiary rules.

### C.      Nicole Coleman Testimony

The State's key witness at trial was Alexis Grajales.  On direct examination, Grajales testified that he and West had entered Ms. Cuyler's home in the early morning hours of July 9, 1998, and that West had killed Jarrell and wounded Lindsey.  On cross-examination, Grajales testified that he did not recall ever having broken into a house prior to that morning, and that he had never told West that he previously had broken into a house in the middle of the night. Thereafter, West informed the State that she would seek to call Nicole Coleman.  West had shared a cell with Coleman during her pretrial incarceration.  West argued that Coleman would testify that Grajales was an experienced burglar and thief.  The State objected to Coleman's testimony on the basis that it constituted inadmissible extrinsic evidence of a collateral matter. The trial court sustained the state's objection to the testimony on that basis.  On appeal to the Connecticut Supreme Court, West argued that her Sixth Amendment right was violated by the trial court's refusal to allow Coleman's testimony.  The State does not dispute that West has exhausted this claim of error.

West argues that the trial court improperly precluded her from calling Nicole Coleman in violation of her Sixth Amendment right to call witnesses in her defense.  Specifically, she argues that Coleman's testimony would have demonstrated that Grajales was involved in a series of criminal activities and demonstrated that Grajales had a motive to testify falsely to avoid violating his cooperation agreement with the State.[27]

_____

[27]West argued in her brief and reply brief in this habeas action that the Coleman evidence was admissible under Conn. Code Evid. §§ 6.6(b) (specific instances of conduct to impeach), 4.5(b) ("evidence of other crimes, wrongs or acts"), and 6.5 (evidence of bias).  (See Petr.'s

The United States Supreme Court has explained that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." Taylor v. Illinois, 484 U.S. 400, 408 (1987). However, "more than the mere absence of testimony is necessary to establish a violation of the right." United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982). The accused in the exercise of this right "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers, 410 U.S. at 302. In order to state a violation of her Sixth Amendment right to compulsory process, a defendant must "at least make some plausible showing of how their testimony would have been both material and favorable to his defense." Valenzuela-Bernal, 458 U.S. at 867; see, e.g., Washington v. Texas, 388 U.S. 14, 16 (1967) (holding that the defendant's Sixth Amendment right had been violated when he was arbitrarily deprived of "testimony [that] would have been relevant and material, and . . . vital to the defense"). Pertinent to this determination is "the strength of the prosecution's case," as "[i]n a close case, 'additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.' " Washington v. Schriver, 255 F.3d 45, 59 (2d Cir. 2001) (quoting Jones v. Stinson, 229 F.3d 112, 120 (2d Cir. 2000)).

The Connecticut Supreme Court did not explicitly rule on this issue as a matter of federal law and the Sixth Amendment right of a defendant to call witnesses on her behalf. Rather, the Court found the trial court had not erred from an evidentiary standpoint, as follows:

> [W]e agree with the state that Grajales' alleged experience as a burglar had little, if any, bearing on the central issue in the case, namely, whether West was the person who had accompanied Grajales into Tammi Cuyler's home on July 9,

Mem. Law in Supp. for Writ of Habeas Corpus 61-70 and Petr.'s Reply Brief 19-21.)

> 1998, and had attacked Jarrell and Lindsey.  Simply put, Grajales' experience as a
> burglar had virtually nothing to do with the issue of whether West or some
> unidentified person had accompanied Grajales into the victims' home on the night
> of the attack.  Consequently, the trial court properly concluded that Grajales'
> testimony regarding his experience as a burglar was not subject to impeachment
> by extrinsic evidence.

West, 274 Conn. at 642-43.  As to West's argument that Coleman's testimony should have been

allowed under a Connecticut rule that permits the use of extrinsic evidence to impeach a witness

for the purpose of showing bias, prejudice or interest, based on West's theory that Grajales lied

about his past criminal activity to protect his cooperation agreement, the Court held:

> There is nothing in the record to indicate that the state ever asked Grajales
> whether he had committed other burglaries.  There is no reason to believe,
> therefore, that any concession by Grajales that he previously had committed
> burglaries would have given rise to a violation of his plea agreement.
> Consequently, West's contention that Grajales had a motive to conceal his alleged
> prior burglaries must fail because it lacks support in the record.

Id. at 643-44.

The Connecticut Supreme Court's holding that Coleman's testimony was properly

excluded under the Connecticut rules of evidence, largely because the testimony was not relevant

to whether West was the second intruder with Grajales or whether Grajales was protecting his

cooperation agreement, comports with United States Supreme Court precedent, which allows for

evidentiary rules that assure fairness and reliability, and focuses on whether the testimony would

be material and favorable to the defense.  See Valenzeula-Bernal, 458 U.S. at 867.  In particular,

Coleman's testimony that Grajales had told West that he was an experienced burglar was not

favorable to West's case, as the issue in dispute was not whether Grajales was capable and

willing to burglarize–he admitted he did break into Cuyler's home–but whether or not West was

the second intruder with Grajales.  Moreover, although West now argues the case against her was

-28-

not strong, she does not challenge her convictions on the basis of the sufficiency of the evidence.

Given the strength of the State's case, Coleman's testimony of very little materiality and

relevance would not have lent a reasonable doubt that did not already exist.  Because Coleman's

testimony would not be material or favorable to the defense, its exclusion under state evidentiary

rules was not contrary to federal law and cannot support a writ of habeas corpus.

>   **D.**      **Jury Instructions Regarding Uncalled Witnesses**

At trial, the state called as a witness Detective James McGlynn, who testified that he and

Sergeant Mark Francis had questioned West on July 17, 1998, at the Windsor police department

regarding her activities at and around the time of the attack on Jarrell and Lindsey, and that,

during that questioning, West had confessed to killing Jarrell.  Neither the State nor West called

Sergeant Francis as a witness.  The State also called as a witness Elaine Pagliaro, the acting

director of the state police forensic laboratory, who testified about certain microscopic hair

comparison analyses that she had performed on hair fragments recovered from the crime scene

and from Alexis Grajales' residence.  Kiti Settachatgul, the former director of the state police

forensic laboratory, had also performed those analyses, but neither the State nor West called

Settachatgul as a witness.

The trial court initially instructed the jury that it "could draw no inference from the

election of the state not to call as witnesses Sergeant Mark Francis and Kiti Settachatgul."  The

trial court later instructed the jury "[t]hat instruction is stricken in its entirety."  When during

deliberations the jury informed the trial court that it did not understand whether it could draw

conclusions or inferences from the State's failure to call the two witnesses, the trial court re-

instructed the jury on the issues, including stating the following: "You can use the fact that a

witness was not called by a party in assessing the apparent strength or weakness in the party's

case.  If a witness is available, he is equally available to both sides to call as a witness."   On

appeal to the Connecticut Supreme Court, West argued that the trial court's instruction diluted

the State's burden to prove West's guilt beyond a reasonable doubt and undercut the presumption

of innocence.  (Petr.'s Conn. S.C. Br. at 54-59.)  The State does not dispute that this claim is

exhausted.

West argues that the trial court's improper instruction concerning the parties' failure to

call Francis and Settachatgul violated her right to due process.  The Supreme Court has explained

that "[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will

support a collateral attack on the constitutional validity of a state court's judgment is even greater

than the showing required to establish plain error on direct appeal."  Henderson v. Kibbe, 431

U.S. 145, 154 (1977).  The question in a collateral proceeding "is whether the ailing instruction

by itself so infected the entire trial that the resulting conviction violates due process."  Id.

(internal quotations and citations omitted).

The Due Process Clause of the United States Constitution "protects the accused against

conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  In Cupp v.

Naughten, the Supreme Court held that "[b]efore a federal court may overturn a conviction

resulting from a state trial . . . it must be established not merely that the instruction is

undesirable, erroneous, or even 'universally condemned,' but that it violated some right which

was guaranteed to the defendant by the Fourteenth Amendment."  414 U.S. 141, 146 (1973).

Moreover, "a single instruction to a jury may not be judged in artificial isolation, but must be

viewed in the context of the overall charge." Id. at 146-47.  In Cupp, the Supreme Court noted

that the "Court of Appeals in this case stated that the effect of the instruction was to place the

burden on respondent to prove his innocence." Id. at 147.  It explained, however, that "the trial

court gave, not once but twice, explicit instructions affirming the presumption of innocence and

declaring the obligation of the State to prove guilt beyond a reasonable doubt." Id.  On the

whole, the "jury here was charged fully and explicitly about the presumption of innocence and

the State's duty to prove guilt beyond a reasonable doubt," and "[w]hatever tangential

undercutting of these clearly stated propositions may, as a theoretical matter, have resulted from

the giving of the instruction on the presumption of truthfulness is not of constitutional

dimension." Id. at 149.

Here, the Connecticut Supreme Court's ruling complied with United States Supreme

Court precedent.  In deciding whether the jury instruction violated due process, the Connecticut

Supreme Court evaluated the jury instructions as a whole and rejected West's claim that the trial

court's instruction violated the petitioner's due process right to be proven guilty beyond a

reasonable doubt.  The Connecticut Supreme Court held:

> Although the trial court should have refrained from instructing the jury regarding
> the missing witnesses[,] we previously have explained that such an instruction
> does not impermissibly infringe upon the presumption of innocence.  Moreover,
> the trial court thoroughly instructed the jury on that constitutional presumption
> and on the state's burden of proving West's guilt beyond a reasonable doubt,
> expressly underscoring the fact that West had "no burden or obligation to prove
> anything" and that the state "has the burden at all times to establish each of the
> elements of the crime[s] charged beyond a reasonable doubt."  In light of the
> court's instructions as a whole, we are persuaded that there is no reasonable
> possibility that the jury was misled by the challenged portion of the charge.

West, 274 Conn. at 657-58 (internal citations omitted).  This finding was not contrary to and did

not involve an unreasonable application of Supreme Court precedent.  Rather, in accordance with

United States Supreme Court precedent, the Connecticut Supreme Court evaluated the trial court's instruction regarding Francis and Settachatgul in the context of the overall jury charge. Cupp, 414 U.S. at 146.  At West's trial, the court instructed the jury on the constitutional presumption of innocence and the state's burden of proving West's guilt beyond a reasonable doubt.  The trial court also instructed the jury that West had "no burden or obligation to prove anything" and that the state "has the burden at all times to establish each of the elements of the crime[s] charged beyond a reasonable doubt."  When viewed in the context of the whole of the instructions, the trial court's erroneous instruction did not so infect the entire trial to violate due process.

### E.  <u>Microscopic Hair Analysis</u>

Prior to trial, West moved to exclude all expert testimony regarding microscopic hair analysis.  She argued, first, that such evidence is not sufficiently reliable, and second, that in the circumstances of the present case, its probative value was outweighed by its prejudicial effect. Alternatively, West sought a preliminary hearing on the admissibility of any such evidence.  The trial court denied West's motion and her request for a preliminary hearing.

In the instant petition for a writ of habeas corpus, West argues that she was denied her right to a fair trial as guaranteed by the Due Process Clause by the trial court's evidentiary rulings on microscopic hair analysis.  The respondent argues that West did not exhaust this claim because she did not raise it before the Connecticut Supreme Court as a violation of federal law. In fact, in her direct appeal, West argued that the Connecticut Supreme Court should adopt the United States Supreme Court's ruling in <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999) as part of the Connecticut state evidentiary rules.  (Petr.'s Conn. S.C. Br. at 22-32; Petr.'s

Conn. S.C. Reply Br. at 5-13.)  The petitioner now admits that she did not present her due

process argument to the Connecticut Supreme Court, but argues that

> [b]ecause of the way the issue was presented to the Connecticut Supreme Court,
> that court had the occasion to assess whether the admission of the evidence "[was]
> so extremely unfair that its admission violates fundamental conceptions of
> justice."  See Dunnigan v. Keane, 137 F.3d at 125 (quoting Dowling v. United
> States, 493 U.S. at 352).  Therefore, the state court had the opportunity to address
> the alleged violation of the petitioner's federal rights as required by federal habeas
> corpus law.  See Picard v. Connor, 404 U.S. 270, 275 (1971).

(Petr.'s Reply Mem. at 23.)

This Court finds that West's due process argument is unexhausted.  As previously noted,

the exhaustion doctrine requires that the petitioner gave the state court the "opportunity to pass

upon and correct" alleged violations of its prisoners' federal rights, which means that the

"prisoner must 'fairly present' his claim in each appropriate state court . . ., thereby alerting that

court to the federal nature of the claim."  Baldwin, 541 U.S. at 29 (quoting Duncan, 513 U.S. at

365).  In the Picard case to which West cites, the United States Supreme Court found that

although the petitioner had presented to the state courts all the facts that would be necessary to

rule on the constitutional claim, the constitutional claim was unexhausted because it "was never

brought to the attention of the state courts."  Picard v. Connor, 404 U.S. 270, 277 (1971).  As in

Picard, West did present all of the facts necessary to her constitutional claim to the Connecticut

Supreme Court, but she did not argue to that court that those facts had a constitutional dimension

and amounted to a violation of her due process rights, as she now claims.  Rather, she merely

argued that as an issue of state evidentiary law, Connecticut should adopt the ruling of the United

States Supreme Court in <u>Kuhmo Tire</u>.[28]  Therefore, West's claim is unexhausted and cannot

serve as a basis for a writ of habeas corpus.

IV.      <u>**Conclusion**</u>

West's Petition for a Writ of Habeas Corpus [Dkts. # 1 & 9] is DENIED.  Judgment shall

enter for the respondent.  A certificate of appealability shall not issue as the Petitioner has not

made a substantial showing of the denial of a constitutional right.  The Clerk is directed to close

this case.

**SO ORDERED.**

Dated this <u>7th</u> day of January, 2010, at Hartford, Connecticut.




                    **/s/ Christopher F. Droney**
                    **CHRISTOPHER F. DRONEY**
                    **UNITED STATES DISTRICT JUDGE**

---

[28]Although West did argue for the Connecticut courts to adopt federal law as announced by the Supreme Court of the United States, she did not argue that the state's current evidentiary rules, as applied by the trial court, were in violation of federal law.  The United States Supreme Court's decision in <u>Kuhmo Tire</u> is an interpretation of the Federal Rules of Evidence, which are obviously not binding on the states.